2024 IL App (1st) 220917-U

No. 1-22-0917

Order filed September 13, 2024

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 12134 |
| | ) | |
| RAY COLEMAN, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge presiding. |

_____

JUSTICE NAVARRO delivered the judgment of the court.
Justices Mitchell and Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not err by allowing the State to introduce course-of-investigation testimony; the prosecution's closing and rebuttal arguments were proper; the trial court did not err by barring defense counsel from eliciting a witness's grand jury testimony about the caliber of the gun used in the shooting; trial counsel was not ineffective for failing to tender jury instructions defining "knowledge"; and the State proved defendant guilty of aggravated battery with a firearm beyond a reasonable doubt. Affirmed.

¶ 2    Following a jury trial, defendant, Ray Coleman, was found guilty of first-degree murder and aggravated battery with a firearm. He was sentenced to 50 years and 20 years in prison,

respectively, to run consecutively. On appeal, defendant contends that (1) the trial court erred by allowing the State to introduce out-of-court statements from unspecified witnesses; (2) the State violated defendant's right to a fair trial in closing argument by relying on hearsay statements, making irrelevant emotional pleas, misstating a DNA expert's testimony, and suggesting a motive for a witness to recant testimony without any evidentiary support; (3) the trial court erred by barring the defense from discussing a witness's grand jury testimony that defendant had a .45-caliber gun; (4) the trial court committed reversible error by failing to instruct the jury on the definition of "knowledge," and trial counsel was ineffective for not requesting the pattern instruction defining this mental state; and (5) the State failed to prove defendant guilty of aggravated battery beyond a reasonable doubt. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     At trial, John Clark testified that his grandmother lived at 326 West 106th Street in Chicago. On the evening of July 6, 2016, he was in the back of his grandmother's house "just hanging out" with several people. One of those people was Latavious Beal, his cousin. They were drinking beers and smoking marijuana. Defendant, who Clark had known for about 10 years, arrived at the house with someone named Dave, and Maurice ("Reese") Ross. Maurice had a picture on his shirt of his brother, who had been killed. Someone at the party asked Maurice about his shirt, and defendant said to "forget that, man. Just roll up," which meant roll up some more weed.

¶ 5     Clark testified that there were motion lights on where they were sitting. Defendant got up, walked over to Beal, and tried to hand him a "black automatic" gun from his waistband. Beal would not take it, so defendant put the gun inside the barbecue grill. Shortly thereafter, defendant retrieved the gun from the grill, put it back in his waistband, and suggested that the group walk

him home. The group at that point was Clark, Dave, Ross, and Beal. Defendant's house was about six houses down the alley.

¶ 6    When they got into the alley, Clark was drinking his beer when he heard a boom. He looked and saw defendant pointing the gun that had been at his waistband. Clark felt a sting in his neck, grabbed his neck, and saw blood. As Clark was turning, he saw defendant "pointing towards [Ross]" and saw a flash. Ross fell back and Clark saw defendant standing over him. Clark ran back through the gate and heard three or four more shots as he was running. Clark ran to the front door of his grandmother's house. The door was locked so he had to bang on the door. His younger cousin, Tiaria Wren, opened the door and started screaming. She asked what was wrong and Clark told her, "Ray just shot me, he just shot me." Clark remembers an ambulance arriving and telling paramedics, "Ray Coleman shot me." He then passed out. Clark testified that he woke up at Christ Hospital, where he was interviewed by detectives and identified defendant.

¶ 7    Clark identified some exhibits, one of which was a bottle of Crown Royal "that Ray and Dave had" on the night in question.

¶ 8    Clark testified that while an Assistant State's Attorney came to the hospital, he did not tell that person that defendant had shot him because, "I wanted to get revenge myself. And I was going to try to do the same thing he did to me." On cross-examination, Clark testified that when he testified before the grand jury, he stated that he had not seen who shot Ross.

¶ 9    Latavious Beal testified that he was currently serving a sentence in Michigan for armed robbery. He had previously been convicted of two other burglaries. He has known defendant all his life. When asked who was at the scene of the incident on the night in question, he claimed he did not remember. He said defendant was there "for a little minute." He did not know who shot the victims. He left when he heard gunshots.

¶ 10    Beal was then impeached by his grand jury testimony wherein he testified that on the night in question he was in the back of his grandmother's house with "Uncle Debo, Little Ray, Little Reese, and Dave." Uncle Debo was John Clark. Defendant tried to give him a gun but "my auntie seen him and told him don't give it to me." Beal stated that the gun was black, and that defendant put the gun in the barbecue grill after that. Ten minutes later he took the gun back out, "put it on his waist and told us that he's going to go home and we was going to walk him home." Beal testified at the grand jury that he saw defendant pull the gun out of his waistband and start shooting. He shot Maurice one time in the face, and he fell. Then defendant stood over him and Beal ran away. As he ran away, he heard 11 or 12 more shots.

¶ 11    Beal's grand jury testimony was that as he was running, Clark was running with him and said he had been shot. They ran through the front door of his grandmother's house and Beal helped Clark with the gunshot wound.

¶ 12    During trial, the State asked if Beal had been interviewed by detectives prior to Beal's grand jury testimony. Beal stated that he did, but they treated him "poorly." He was then impeached by his grand jury testimony in which he stated that he had been treated "very good" by detectives, and that they did not threaten him or promise him anything.

¶ 13    Tiaria Wren testified next for the State. She stated that her grandmother lives at the property in question. On the night of the incident, she arrived at the property at about 8 or 9 p.m. It was dark outside, but she saw people in the backyard. She walked back there and saw defendant, who is known as "Little Ray," and who she has known her whole life. She also saw her two cousins, John Clark, known as "Debo," and Latavious Beal, known as "Tavi." Two other individuals were there as well – Maurice ("Reese"), and Dave.

¶ 14    Wren eventually went inside. When she was inside, she heard gunshots coming from the back of the house. When she opened the front door, Clark was there "holding his thumb to his neck, and blood was squirting out." Clark told her, "Ray shot me." He then stumbled into the house and fell to the ground. Beal was also there, so he put pressure with a towel on Clark's neck while Wren called an ambulance. An ambulance arrived minutes later and took Clark away.

¶ 15    Officer Tracey Drew testified that he is a police officer with the Chicago Police Department and was on duty on the night in question. He was working with a partner, Reginald Pippen. At about 10:30 p.m., they were patrolling when they heard gunshots. They started driving towards the area when a young woman waved them down. Officer Drew spoke to people on the scene and received the nickname of "Little Ray."

¶ 16    Sergeant Joseph McGuire testified that he was asked by investigating detectives to be an independent photo array administrator for Beal at 2:20 a.m. on July 8, 2016. He knew nothing about the case when he met with Beal and showed him the array. Beal consented to being videotaped as he viewed the array. Sergeant McGuire testified that Beal circled the first picture and signed his name.

¶ 17    Detective Thomas Lieber testified that when he arrived on the scene, he observed a trail of blood from the house to the alley and saw Ross's body in the alley. He spoke with people at the scene, including Beal and Wren. After these conversations, he was looking for someone named "Little Ray." Detective Lieber went to the hospital the next day and interviewed Clark. On cross-examination, Detective Lieber testified that Wren never told him that Clark identified defendant as the shooter after he had been shot.

¶ 18    A forensic investigator photographed and videotaped the scene and recovered a fired bullet and cartridge casings from the alley, a cartridge case from under the victim's body, a baseball cap

from the front of the house, drinking cups, cigarillo wrappers, and glass bottles from the backyard tables. A fingerprint analyst testified that he received cups, bottles, cigarillo wrappers, and defendant's fingerprint card. He identified defendant's latent fingerprints on one wrapper.

¶ 19    A forensic scientist testified that she recovered defendant's buccal swab standard, which she developed into a DNA profile. She also received plastic cups and glass bottles. She swabbed the "mouth areas" and developed DNA profiles. A mixed DNA profile from which defendant could not be excluded was identified on a glass bottle. The expected frequency of this profile was approximately 1 in 180 sextillion.

¶ 20    A firearms examiner testified that she received firearm evidence, including .40-caliber cartridge casings and bullet fragments. The bullet fragments appeared to be fired from the same firearm, and the cartridge casings appeared to be fired from the same firearm. Because she did not have the firearm, she could not compare the casings and bullet fragments.

¶ 21    A medical examiner testified that the victim died from multiple gunshot wounds.

¶ 22    After the State rested, defense counsel introduced a stipulation that a defense investigator would testify that he visited Beal in a Michigan prison on August 19, 2019. Beal told the investigator that he had seen defendant leave the party on the night in question. Dave had asked the remaining people to walk him home, and Beal said no. As Beal walked towards the front of the house, he heard gunshots and ran. He did not know who fired the shots. Beal told the investigator that the police and his family told him that his parole would be revoked if he did not say that defendant shot Ross and Clark.

¶ 23    Following closing arguments, the jury began deliberations. During deliberations, the jury sent a note stating: "The defendant accidentally caused injury to John Clark. Does that mean he knowingly caused injury to John Clark." The parties and court agreed to respond by telling the

jury that it had all the evidence and law and should continue to deliberate. The jury ultimately found defendant guilty of first-degree murder of Ross and aggravated battery with a firearm of Clark.

¶ 24    Defense counsel filed a motion for a new trial arguing that the evidence was insufficient, that the court improperly limited his closing arguments, and that the prosecutor erred in closing argument.

¶ 25    Defendant subsequently hired a new attorney for posttrial proceedings, who filed a new motion for a new trial incorporating trial counsel's motion and adding a claim that trial counsel was ineffective for not calling Jasmine Beal, Latavious Beal's sister. The trial court denied the motion. Defendant was sentenced to 50 years for first-degree murder, and 20 years for aggravated battery, to run consecutively. Defendant now appeals.

¶ 26                                    II. ANALYSIS

¶ 27                              A. Hearsay Statements

¶ 28    On appeal, defendant first contends that the trial court improperly admitted hearsay testimony from Officer Drew and Detective Lieber that unknown, non-testifying witnesses identified "Little Ray" as the shooter, and that he was prejudiced when the State relied on that testimony in closing argument. The State responds that the trial court properly admitted the testimony for the non-hearsay purpose of explaining why the police included defendant in a photo array shortly after the shooting.

¶ 29    As an initial matter, defendant acknowledges that this issue was not preserved for appeal because defense counsel did not raise it in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (both an objection at trial and a written posttrial motion specifying the issue are necessary to preserve an alleged error on appeal). Failure to object to the error at trial or to raise the error in

a posttrial motion results in forfeiture. However, it is appropriate to excuse a defendant's procedural default in two instances: (1) when "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) when "a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 30 The initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial. *Id*. Defendant takes issue with Officer Drew's and Detective Lieber's testimony that they were looking for someone named "Little Ray" after talking to witnesses on the scene. Defendant claims that this testimony was hearsay evidence, as it was offered to show the truth of the matter asserted, namely, that witnesses identified defendant as the shooter.

¶ 31 "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted, and it is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule." *People v. Olinger*, 186 Ill. 2d 326, 357 (1997). Testimony about an out-of-court statement which is used for a purpose other than to prove the truth of the matter asserted in the statement is not hearsay. *People v. Simms*, 143 Ill. 2d 154, 174 (1991).

¶ 32 Our supreme court has held that "a police officer may recount the steps taken in the investigation of a crime, and may describe the events leading up to the defendant's arrest, where such testimony is necessary and important to fully explain the State's case to the trier of fact." *Id*. Our supreme court has also held that "a police officer may testify about his conversations with others, such as victims or witnesses, when such testimony is not offered to prove the truth of the

matter asserted by the other, but is used to show the investigative steps taken by the officer." *Id*. "Testimony describing the progress of the investigation is admissible even if it suggests that a non-testifying witness implicated the defendant." *Id*.

¶ 33 Here, the complained-of testimony was offered to explain why the police put defendant in a photo array two days after the incident. Both Officer Drew and Detective Lieber testified that while investigating the crime scene shortly after the shooting, witnesses had provided to them the name "Little Ray," prompting police officers to look for a person with that nickname. A photo array was conducted by an independent administrator about two days later, in which Clark and Beal identified defendant as the shooter. The testimony explained why the officers put defendant's picture in a photo array for Beal and Clark to identify so soon after the incident. The testimony was not offered to prove that defendant was the shooter, but rather to show the investigative steps taken after the officers arrived on the scene. Accordingly, we find that the officers' testimony was admissible, even if it implicated defendant, because it described the progress of the investigation. *Id*. Finding the complained-of testimony admissible, it follows that there was no clear or obvious error that would warrant plain error review. Accordingly, defendant's claim of ineffective assistance of counsel for not properly preserving the issue also fails. See *People v. Easley*, 192 Ill. 2d 307, 317-18 (2000).

¶ 34 Defendant's reliance on *People v. Ochoa*, 2017 IL App (1st) 140204, does not convince us otherwise. In *Ochoa*, two detectives testified at length about their questioning of the defendant's codefendants at the police station, and the information that was garnered from those interviews. The State "repeatedly elicited testimony with the strong inference that defendant's co-defendants implicated him to the police." *Id*. ¶ 52. The exchange went "beyond mere questioning concerning the investigatory process," and "included serial questions to build the inference that defendant was

named by his criminal cohorts." *Id*. The court found that the testimony was "in no way limited to the actions police took as part of the process, but instead the jury was informed that, with co-defendants *** at the police station, the detectives discovered the defendant's home address, nickname, gender, ethnicity, height and build, and information about his tattoo." *Id*.

¶ 35    Here, the testimony elicited from Officer Drew and Detective Lieber was that after talking to people on the scene, they were looking for someone named "Little Ray." There were no descriptions of defendant elicited, no repeated questioning about what the witnesses at the scene told the officer or detective, and no serial questioning of the witnesses.

¶ 36    Moreover, even if we were to find that the testimony amounted to inadmissible hearsay, we would nevertheless find that the admission was not plain error. The admission of hearsay identification testimony amounts to plain error "only where it serves as a substitute for courtroom identification or is used to strengthen and corroborate a weak identification." *People v. Hughes*, 259 Ill. App. 3d 172, 178-79 (1994). Furthermore, the improper admission of hearsay evidence is harmless error where it is "merely cumulative or is supported by a positive identification and other corroborative circumstances." *People v. Prince*, 362 Ill. App. 3d 762, 776 (2005). Here, before either Officer Drew or Detective Lieber even testified, the jury heard Clark identify defendant as the shooter. Clark testified that he saw defendant pointing a gun towards Ross and saw a flash. He saw Ross fall to the ground, and saw defendant standing over him. Clark testified that he ran into his grandmother's house and told his cousin that defendant shot him. Clark also testified that he told paramedics that defendant shot him. The jury then heard Beal's grand jury testimony wherein Beal stated that on the night in question he saw defendant pull a gun out of his waistband and start shooting. He saw defendant shoot Ross once in the face and heard several more shots as he ran away. The jury then heard from Wren that she was in her grandmother's house when she heard

gunshots. She testified that Clark came inside holding his bleeding neck and told her defendant shot him. By the time Officer Drew and Detective Lieber testified at trial, the testimony indicating that they were looking for someone named "Little Ray" after talking to witnesses on the scene, was merely cumulative of testimony that was already in evidence. See *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 90 (erroneous admission of hearsay testimony is harmless if merely cumulative of other properly admitted evidence in the record). Accordingly, "if an error was harmless it most certainly cannot rise to the level of plain error." *People v. Leach*, 2012 IL 111534, ¶ 141; see also *People v. Campbell*, 2015 IL App (1st) 131196, ¶ 37 (erroneous admission of identification testimony harmless and did not constitute plain error).

¶ 37                                        B. Closing Arguments

¶ 38    Defendant's next contention on appeal is that the State's closing argument and rebuttal argument were improper where: (1) the prosecutor referenced the course-of-investigation testimony discussed above; (2) the prosecutor made an emotional plea by commenting on the victim's birthday and missing milestones; (3) the prosecutor conflated the DNA and fingerprint testimony; and (4) the prosecutor argued without evidence that Beal recanted prior testimony due to being incarcerated.

¶ 39    Prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they resulted in substantial prejudice to the defendant. *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007); *People v. Moody*, 2016 IL App (1st) 130071, ¶ 60. During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel which clearly invite response, and comment on the credibility of witnesses. *Moody*, 2016 IL App (1st) 13071, ¶ 60. However, it is improper for a prosecutor to argue inferences or facts not based upon the

evidence in the record. *Id*. In reviewing whether comments made during closing argument are proper, the closing argument must be viewed in its entirety, and the remarks must be viewed in context. *Id*. "A closing argument must serve a purpose beyond inflaming the emotions of the jury." *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005).

¶ 40 In addition, where the jury was both admonished and instructed that neither opening statements nor closing arguments were evidence, and to disregard any statement or argument made by the attorneys not based on the evidence, there is a presumption that the jury followed the trial judge's instructions in reaching a verdict. *People v. Simms*, 192 Ill. 2d 348, 373 (2000).

¶ 41                              i. Reference to Course-Of-Investigation Testimony

¶ 42 Defendant argues that the State's reference during rebuttal argument to the course-of-investigation testimony, discussed above, bolstered the identification evidence and rebutted the defense argument that the witnesses were not reliable. Defendant concedes that this issue was not preserved for appeal but asks us to either review it under the plain error doctrine, or because defense counsel was ineffective for failing to preserve the issue for appeal. As discussed above, the first step in a plain error analysis is to see if there was a clear or obvious error. *Piatkowski*, 225 Ill. 2d at 565.

¶ 43 The first complained-of comments were in rebuttal argument where the prosecutor stated:

"[Defendant's] DNA was there, well then, he must have left early because he was there. But does that make any sense that people are just going to choose him to put the case completely on him? And think about it, when the police arrive to the scene, they get the name Little Ray right away. Two days later, Latavious Beal is on video saying that Ray Coleman was someone who shot Maurice Ross."

¶ 44    As discussed above, the statements from witnesses to the police at the scene of the shooting were properly admitted into evidence as course-of-investigation testimony. The testimony was introduced to explain why the police officers put defendant in a photo array that was given to Clark and Beal within two days of the shooting. Accordingly, it was proper for the prosecutor to reference these statements during rebuttal closing argument, since a prosecutor may properly comment on the evidence, or reasonable inferences drawn from that evidence, during closing arguments. *Moody*, 2016 IL App (1st) 13071, ¶ 60. Because it was proper for the prosecutor to comment on course-of-investigation testimony, we find that there was no plain error, and no ineffective assistance of counsel for failing to preserve the alleged error for review. See *Easley*, 192 Ill. 2d at 317-18. Defendant presents nothing to counter the presumption that the jury followed the trial judge's instruction that closing argument was not evidence and to disregard any argument made by the attorneys not based on evidence. *Simms*, 192 Ill. 2d at 373.

¶ 45                            ii. Improper Appeal to Emotions

¶ 46    Defendant's next contention regarding closing arguments is that the prosecutor made an improper emotional plea during rebuttal argument. Specifically, defendant takes issue with the following argument by the State:

> "December 5 was yesterday. Now, if you recall from a few days ago when Brandy Snipe, Maurice Ross's sister testified, she told you her brother's birthday was December 5. Now, instead of December 5 being a day of celebration, a day where people got together in a restaurant or house or a bar to celebrate Maurice Ross's birthday, December 5 of this year was the second day of testimony at Maurice Ross's murder trial.

July 6, 2016, Maurice Ross went to a house in the 300 block of 106th Street with a shirt with his slain brother's image on it.

\*\*\*

What does the scene tell you when Maurice Ross, wearing his slain brother's shirt, was lying on the ground splattered with bullet holes?

\*\*\*

Yesterday was supposed to be a day of celebration for Maurice Ross. \*\*\* Yesterday was supposed to be a celebration for Maurice Ross but it wasn't. Today could be a day of justice for Maurice Ross and for John Clark. Today is your opportunity to follow the evidence and come to the conclusion that this defendant, Ray Coleman, is guilty of first degree murder and aggravated battery."

¶ 47 Defendant argues that these comments during rebuttal closing arguments were "playing on [the jurors'] emotions to secure a guilty verdict." Defendant acknowledges that this issue has not been preserved on appeal but again urges us to review it under the plain error doctrine, or to find that defense counsel was ineffective for failing to preserve it for appeal.

¶ 48 Here, the prosecutor's mention of the victim's birthday was not improper where it was based on the evidence. See *Moody*, 2016 IL App (1st) 13071, ¶ 60 (the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence). Brandy Snipe testified at trial that the victim was her brother, and that his date of birth was December 5, 1991. The prosecutor's comments regarding the victim's sister, or the victim's slain brother, were also not improper. Incidental evidence of a victim's family is not only permissible, but in most trials, unavoidable, since "[c]ommon sense tells us that murder victims do not live in a vacuum and that, in most cases, they leave behind family members." *People v. Free*, 94 Ill. 2d 378 (1983).

Accordingly, we find that after reviewing the entirety of the closing argument, the prosecutor's comments, viewed in context, were not improper. *Moody*, 2016 IL App (1st) 13071, ¶ 60.

¶ 49 Even if we were to find that the mention of the victim's birthday, and the fact that he would miss out on celebrating any future birthdays, may have improperly appealed to the jurors' emotions, we would not find that the comments engendered substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them. *Wheeler*, 226 Ill. 2d at 123; *People v. Brooks*, 345 Ill. App. 3d 945, 951 (2004) (a reviewing court will not reverse a jury's verdict based on improper remarks made during closing arguments unless the comments resulted in substantial prejudice to the defendant and constituted a material factor in his conviction). In addition, defendant presents nothing to counter the presumption that the jury followed the trial judge's instruction that closing argument was not evidence and to disregard any argument made by the attorneys not based on evidence. *Simms*, 192 Ill. 2d at 373. Accordingly, we find that because the comments did not amount to reversible error, there was also no plain error. *People v. Williams*, 2022 IL 126918, ¶ 49 (the defendant cannot obtain relief under the plain error doctrine if he would not have been entitled to relief on the same error if preserved). It also follows that there was no ineffective assistance of counsel for failing to preserve the alleged error. See *Easley*, 192 Ill. 2d at 317-18; *Williams*, 2022 IL 126918, ¶ 57 (a prosecutor's comment – whether preserved and attacked directly or unpreserved and attacked indirectly via the alternative contentions of plain error and ineffective assistance of counsel – must have been damaging enough that it severely threatened to tip the scales of justice against the defendant).

¶ 50                                    iii.  DNA Expert Testimony

¶ 51 Defendant's next contention regarding closing arguments is that the prosecutor misstated the DNA expert's testimony. We reiterate that prosecutors are afforded wide latitude in closing

argument, and that they may properly comment on the evidence presented or reasonable inferences drawn from the evidence. *Wheeler*, 226 Ill. 2d 92, 122 (2007); *Moody*, 2016 IL App (1st) 13071, ¶ 60. In reviewing whether comments made during closing argument are proper, the closing argument must be viewed in its entirety, and the remarks must be viewed in context. *Id*.

¶ 52    Here, defense counsel stated during closing arguments that while DNA evidence on a bottle placed defendant in the backyard at some point, it did not do anything to make him the shooter, and the State never sent shell casings and bullets for DNA testing.

¶ 53    In rebuttal, the State argued:

"The physical evidence. First of all, you heard about the prints. They ask, oh, were there – did you send the shell casings for prints? And he explained to you clearly why you're not going to find prints on shell casings. The fingerprint person told you clearly. And then the DNA expert testified, she told you I test fluids. I see blood, urine, vomit. That's what I test. Touch DNA, you're rarely going to get anything. And this is touch DNA that would have gone through a weapon. You're not going to get anything. There is no DNA. There is no blood on the scene. There isn't bloody shell casings. If there's blood on the shell casings, it was the victim's."

¶ 54    Defendant argues that the State's rebuttal was inaccurate because the DNA expert never testified that DNA gets destroyed as it goes through a weapon, but rather it was the fingerprint expert who stated that shell casings are not good surfaces for fingerprints because they can get wiped off or damaged from the extreme heat of a gunshot. The State responds that the prosecutor's comments were not improper, but rather based on all the evidence and reasonable inferences drawn therefrom. We agree with the State.

¶ 55    The evidence presented at trial from the DNA expert was that she tests samples for DNA analysis including blood, semen, saliva, and cellular material like skin cells or "any kind of cells that you leave behind from touching or wearing an item." She testified that while she did receive a plastic bag and cigar package, they were "not items that we normally process through DNA" because they "may contain some touch DNA, but are generally not a good quality source of DNA or have a large amount of DNA and possibly better suited for latent print section." She was not given any shell casings or bullet fragments to test. The latent print examiner testified that shell casings are not a good surface to find suitable impressions because they are fragile and the process of firing a bullet could wipe off or destroy details of the impression.

¶ 56    Accordingly, the prosecutor's comments that there was no blood on the scene except from that of the victim's, and therefore no reason to test the shell casings for DNA, was entirely based on the testimony presented by the DNA expert at trial. The prosecutor also stated that any DNA on the shell casings would be "touch DNA" which the DNA expert testified is hard to test, and better suited for fingerprint analysis. Accordingly, the prosecutor's comments that "you're not going to get anything" by "touch DNA" going through a weapon was a reasonable inference based on the evidence presented at trial.

¶ 57    In addition, defendant presents nothing to counter the presumption that the jury followed the trial judge's instruction that that closing argument was not evidence and to disregard any argument made by the attorneys not based on evidence. *Simms*, 192 Ill. 2d at 373. Accordingly, because there was no error here, there was again no plain error or ineffective assistance of counsel. *Easley*, 192 Ill. 2d at 317-18; *Williams*, 2022 IL 126918, ¶ 57.

¶ 58                                          iv. Beal's Recantation

¶ 59    Defendant's final contention related to closing arguments is that the State's argument that Beal changed his story because he was incarcerated was improper and not based on the evidence. The complained-of comments appeared in the following argument from the prosecutor:

"Now, [Beal] cooperated with the police officers, with the State's Attorneys when this case first started. But [Beal's] situation has changed dramatically since that time. [Beal] is in prison and the rules in prison are different than they are at your home."

¶ 60    Defense counsel objected, and the court overruled the objection stating, "Let's hear what the rest of it is." The State then argued:

"[Beal] has reasons why he doesn't want to testify now against the defendant. Things are different now for [Beal], but thankfully that wasn't the only time [Beal] testified. He also testified in front of a Grand Jury, and he also gave a statement on video when he identified the defendant as the sole shooter that night as well."

¶ 61    This was not an improper argument. The evidence presented at trial was that Beal was serving a sentence for armed robbery in a Michigan prison. Prior to serving that sentence, he had given both a videotaped identification of defendant as the shooter and identified defendant to a grand jury as the shooter. Accordingly, the statements made by the prosecutor that Beal had recanted his earlier statements after being in jail, and that things are different now, are reasonable inferences from the evidence presented.

¶ 62    Defendant's reliance on *People v. Rivera*, 277 Ill. App. 3d 811 (1996), and *People v. Brown*, 113 Ill. App. 3d 625 (1983), do not persuade us otherwise. Both cases concerned a prosecutor's closing arguments that either explicitly stated or clearly implied that a witness feared retaliation by the defendant or his associates, without any evidentiary support. Here, however, the

prosecutor's generalized statements did not attribute Beal's fear to any intimidation by, or fear, of defendant. Rather, the State recounted evidence that Beal cooperated with the police and gave a statement to the grand jury previously, but that when he took the stand in defendant's trial, while serving a prison sentence in Michigan, he recanted that testimony. These comments were based on evidence and did not explicitly suggest that Beal changed his story because defendant threatened him. We find no error based on this argument.

¶ 63                      C. Beal's Grand Jury Testimony Regarding the Firearm

¶ 64     Defendant next contends that the trial court abused its discretion when it reconsidered its ruling on the admissibility of Beal's grand jury testimony that he saw defendant with a .45-caliber firearm. Evidence was presented at trial that .40-cablier ammunition was recovered at the scene and from the autopsy of the victim. At trial, Beal testified that he did not see defendant with a gun that night. The State then called an Assistant State's Attorney to admit defendant's prior inconsistent statements that he gave to the grand jury, indicating that he had seen defendant with a gun on the night in question. On cross-examination, defense counsel asked the Assistant State's Attorney if Beal had said the gun was a .45-caliber gun. The State objected, claiming that the testimony being elicited was "not impeaching." The court overruled the objection and defense counsel went on to elicit Beal's testimony that defendant had a .45-caliber gun on the night in question, and that he knew the difference between a .40-caliber a .45-caliber gun.

¶ 65     The next day, the court changed its ruling and found that the testimony about a .45-caliber gun was not impeaching because Beal was not confronted at trial with his statement about the caliber of the gun. At the State's request, the court did not strike the evidence because the State did not want to draw more attention to it. Instead, the court barred defense counsel from using Beal's grand jury testimony about a .45-caliber gun in closing arguments.

¶ 66    A prior statement is admissible as substantive evidence if it is inconsistent with the witness's trial testimony, the witness is subject to cross-examination about the statement, and the statement was made under oath. 725 ILCS 5/115-10.1 (West 2020). Before a witness's prior inconsistent statement may be admitted, counsel must lay a proper foundation by asking the witness whether he made the inconsistent statement. *People v. McDonald*, 276 Ill. App. 3d 466, 475 (1995). The witness must be given "an opportunity to explain the inconsistency before the introduction of extrinsic evidence of the statement." *People v. Evans*, 2016 IL App (3d) 140120, ¶ 32. A trial court's ruling regarding the admissibility of this evidence is reviewed for an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 67    In the case at bar, defense counsel never asked Beal if he told the grand jury he saw defendant with a .45-caliber gun on the night of the incident, or if he knew the difference between a .45-caliber and a .40-caliber gun. Therefore, the statements lacked a proper foundation to be introduced later through the Assistant State's Attorney's testimony. Accordingly, the trial court did not abuse its discretion in reconsidering its overruling of the State's objection to defense counsel's attempt to introduce the evidence.

¶ 68    Defendant alternatively contends that his trial counsel was ineffective for failing to lay a proper foundation for this evidence, or for failing to assert that the completeness doctrine applied. A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on such a claim, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). To establish deficient performance, the defendant must show that counsel's performance fell below an objective standard of reasonableness. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004). " 'Effective assistance of

counsel refers to competent, not perfect representation.' " *Id*. (quoting *People v. Stewart*, 104 Ill. 2d 463, 491-92 (1984)).

¶ 69    To establish the second prong of *Strickland*, a "defendant establishes prejudice by showing that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." *People v. Houston*, 229 Ill. 2d 1, 4 (2008). A reasonable probability has been defined as a probability that would be sufficient to undermine confidence in the outcome of the trial. *Id*. "A defendant must satisfy both prongs of the *Strickland* test, and a failure to satisfy either one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35.

¶ 70    Here, we note that Beal's grand jury testimony about the .45-cablier gun was put into evidence through testimony by the Assistant State's Attorney and was never stricken from the record. Accordingly, the jury heard Beal's grand jury testimony regarding the .45-caliber gun at trial. Because the testimony was admitted into evidence, it follows there was no deficiency for failing to lay a proper foundation at trial.

¶ 71    Even if we were to find that counsel was deficient in failing to lay a proper foundation, defendant cannot show that there is a reasonable probability that he would have been acquitted had defense counsel been allowed to reference Beal's grand jury testimony during closing arguments. *Houston*, 229 Ill. 2d at 4 (a "defendant establishes prejudice by showing that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different."). Any reference to Beal's grand jury testimony regarding the caliber of the gun would be merely cumulative to the evidence that was already before the jury. Moreover, the evidence against defendant was substantial. Clark identified defendant as the person who shot him and Ross. Beal testified to the grand jury that defendant was the shooter on the night in question.

Wren testified that defendant was there on the night in question and that Clark told her defendant shot him. Defendant's DNA was found on a bottle that was recovered at the scene. Accordingly, defendant has failed to show that his defense was unfairly prejudiced by his counsel's failure to properly impeach Beal on the issue of the caliber of the gun.

¶ 72                                    D. Jury Instructions

¶ 73    Defendant's next contention is that the trial court erred by failing to instruct the jury on the definition of "knowledge" in response to a jury note, or alternatively, that defense counsel was ineffective for failing to request that instruction. The State responds that because defendant acquiesced to the court's response to the note, he cannot now ask for plain error review, or in the alternative, counsel was not ineffective because the trial court properly directed the jury to the instructions and defendant was not prejudiced.

¶ 74    Initially, we note that defendant did not preserve this issue on appeal, and therefore asks us to review it under the plain error doctrine. While the plain-error doctrine allows a reviewing court to consider forfeited errors under certain circumstances, it does not apply when a defendant acquiesces to the alleged error. *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005); *In re Detention of Swope*, 213 Ill. 2d 210, 218 (2004) ("This court has viewed cases of acquiescence strictly, finding that a party's 'active participation in the direction of proceedings *** goes beyond mere waiver' such that the traditional exceptions to the waiver rule do not apply") (quoting *People v. Villareal*, 198 Ill. 2d 209, 227 (2001)). "It is axiomatic that a defendant who acquiesces to an alleged error cannot later argue that he or she was prejudiced by that error." *People v. Houston*, 2024 IL App (3d) 210324, ¶ 23 (citing *People v. Schmitt*, 131 Ill. 2d 128, 137 (1989)).

¶ 75    Here, during jury deliberations, the jurors sent a note out to the trial court that stated: "The defendant accidentally caused injury to John Clark. Does that mean he knowingly caused injury to

John Clark?" The court asked the attorneys what their responses were, and the prosecutor said, "I think you should respond they have the law and all the evidence Continue deliberating. I think the answer is in the jury instructions." Defense counsel responded, "I have the same response, they have the evidence and the applicable law. Continue your deliberations." Because defense counsel affirmatively agreed that the jury instructions were sufficient at the time of jury deliberations, plain error review is not available to defendant. *Houston*, 2024 IL App (3d) 210324, ¶ 23.

¶ 76    Defendant alternatively argues that defense counsel was ineffective for failing to ask for Illinois Pattern Jury Instruction (IPI) 5.01B, defining "knowledge." As stated above, to prevail on a claim of ineffectiveness, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *Petrenko*, 237 Ill. 2d at 496. To establish deficient performance, the defendant must show that counsel's performance fell below an objective standard of reasonableness. *Evans*, 209 Ill. 2d at 219-20. " 'Effective assistance of counsel refers to competent, not perfect representation.' " *Id*. (quoting *Stewart*, 104 Ill. 2d at 491-92).

¶ 77    To establish the second prong of *Strickland*, a "defendant establishes prejudice by showing that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." *Houston*, 229 Ill. 2d at 4. A reasonable probability has been defined as a probability that would be sufficient to undermine confidence in the outcome of the trial. *Id*. "A defendant must satisfy both prongs of the *Strickland* test, and a failure to satisfy either one of the prongs precludes a finding of ineffectiveness." *Simpson*, 2015 IL 116512, ¶ 35.

¶ 78    The function of jury instructions is to provide the jury with accurate legal principles to apply to the evidence so it can reach a correct conclusion. *People v. Hopp*, 209 Ill. 2d 1, 8 (2004). This court has previously held that trial counsel's decision regarding whether to provide a jury

with definitions of particular terms in jury instructions is a matter of trial strategy immune from ineffective assistance of counsel claims. See *People v. Douglas*, 362 Ill. App. 3d 65, 75 (2005).

¶ 79    Here, the jury received the following jury instructions for aggravated battery: "A person commits the offense of aggravated battery with a firearm when he by means of discharging a firearm, knowingly causes injury to another person." See IPI Criminal 4th No. 11.23. The jury's note to the court stated: "The defendant accidentally caused injury to John Clark. Does that mean he knowingly caused injury to John Clark?"

¶ 80    Defendant relies on *People v. Lowry*, 354 Ill. App. 3d 760 (2005), for the proposition that defense counsel was ineffective for failing to offer the proper pattern instruction in response to that question. Specifically, defendant claims that defense counsel should have tendered IPI 5.01B, defining knowledge as:

> "A person [(knows) (acts knowingly with regard to) (acts with knowledge of)] the nature or attendant circumstances of his conduct when he is consciously aware that his conduct is of that nature or that those circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that the fact exists.

> A person [(knows) (acts knowingly with regard to) (acts with knowledge of)] the result of his conduct when he is consciously aware that that result is practically certain to be caused by his conduct."

¶ 81    In *Lowry*, the defendant was charged with aggravated battery with a firearm, as well as attempted first degree murder and armed robbery. *Lowry*, 354 Ill. App. 3d at 761. At trial, evidence was presented that the victim identified a different individual as the person who shot him. *Id.* Two days later, the victim identified the defendant as the person who shot him. *Id.* The defendant gave

a statement to the police that he did not mean to hurt or kill the victim. *Id*. During jury deliberations, the court received a question from the jury that stated, "does 'knowingly' implies [*sic*] that it wasn't an accident, or can it be accidental and knowing?" All the attorneys agreed to respond that the jury had heard the evidence and been instructed on the law, and to keep deliberating. *Id*. at 762. The jury found the defendant guilty of aggravated battery with a firearm. *Id*.

¶ 82    On appeal, the defendant argued that his counsel was ineffective for failing to tender the proper pattern jury instruction defining "knowingly" in response to the question by the jury. *Id*. at 763. The court on appeal found that defense counsel's failure to offer IPI Criminal 5.01B was not trial strategy but, rather, reflected counsel's confusion regarding the jury's question. *Id*. at 767. The record showed that defense counsel believed the jury's question concerned the intent element of the attempted murder charge against the defendant, rather than the jury's confusion over the "knowingly" element of the aggravated battery charge. *Id*. The appellate court found that defense counsel provided deficient representation by failing to answer the jury's question. *Id*. The court further found that defense counsel's deficient performance was prejudicial because a critical issue in the case was whether the defendant "fired the gun knowingly or accidentally." *Id*. The court pointed to the statement defendant gave to the police whereby he stated that he did not mean to hurt or kill the victim. *Id*. at 767-68.

¶ 83    Here, in contrast, defense counsel did not express any confusion regarding the jury's question, and a critical issue in the case was not whether defendant fired the gun knowingly or accidentally. Rather, defense counsel's theory of defense was that defendant left the party on the night in question before the shooting took place, and that the witnesses who identified defendant as the shooter were not credible. There was no argument or evidence presented that defendant accidentally discharged his gun.

¶ 84    Moreover, even if we were to find that defense counsel was deficient for failing to tender IPI Criminal 5.01B, we find that such deficiency would not be prejudicial. *Simpson*, 2015 IL 116512, ¶ 35 ("A defendant must satisfy both prongs of the *Strickland* test, and a failure to satisfy either one of the prongs precludes a finding of ineffectiveness."). To establish the second prong of *Strickland*, a "defendant establishes prejudice by showing that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." *Houston*, 229 Ill. 2d at 4. A reasonable probability has been defined as a probability that would be sufficient to undermine confidence in the outcome of the trial. *Id.*

¶ 85    A person commits battery when he knowingly and without legal justification causes bodily harm to an individual by any means. 720 ILCS 5/12-3(a) (West 2022). To convict a defendant of aggravated battery of a firearm, the State must prove beyond a reasonable doubt that the defendant, in committing a battery, knowingly discharged a firearm and caused injury to another person. See 720 ILCS 5/12-3.05(e)(1) (West 2022).

¶ 86    At trial, Clark testified that he saw defendant with a firearm on the night of the shooting. He saw defendant hold the firearm out and shoot it. He felt a sting on his neck and started to run. He heard additional shots as he ran away with Beal. Wren heard the gunshots and saw Clark with blood gushing from his neck. Clark told Wren that defendant had shot him. Beal testified to the grand jury that he had seen defendant with a gun on the night in question and saw him shoot Ross. Clark identified defendant to police as the person who shot him. Accordingly, we find that the evidence of defendant's guilt of aggravated battery with firearm was so strong that the jury's verdict would not have changed if the jury had been tendered IPI Criminal 5.01B. See *People v. Grabow*, 2022 IL App (2d) 210151, ¶ 39.

¶ 87                    E. Sufficiency of the Evidence

¶ 88    Defendant's final contention on appeal is that there was not enough evidence to find him guilty of aggravated battery with a firearm. When reviewing the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *People v. Bradford*, 2016 IL 118674, ¶ 12.  A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 89    As discussed above, a person commits battery when he knowingly and without legal justification causes bodily harm to an individual by any means. 720 ILCS 5/12-3(a) (West 2020). To convict a defendant of aggravated battery with a firearm, the State must prove beyond a reasonable doubt that the defendant, in committing a battery, knowingly discharged a firearm and caused injury to another person. See 720 ILCS 5/12-3.05(e)(1) (West 2022).

¶ 90    At trial, Clark testified that he saw defendant with a firearm on the night of the shooting. He saw defendant hold the firearm out and shoot it. He felt a sting on his neck and started to run. He heard additional shots as he ran away with Beal. Wren heard the gunshots and saw Clark with blood gushing from his neck. Clark told Wren that defendant had shot him. Beal testified to the grand jury that he had seen defendant with a gun on the night in question and saw him shoot Ross. Clark identified defendant to police as the person who shot him. We find that the State proved defendant knowingly discharged a firearm and caused injury to Clark beyond a reasonable doubt.

¶ 91    Defendant maintains that the note from the jury indicated that the jury thought defendant accidentally shot Clark, and therefore the State did not prove that defendant "knowingly" caused

Clark injury. However, this is mere speculation. See *People v. Spears*, 112 Ill. 2d 396, 409 (1986) (this court will not attempt to "metaphysically divine a jury's collective intent from a single question that may well have only embodied the curiosity or concern of a single juror.") The only "unequivocally clear manifestation of a jury's intent occurs when legally and logically final written verdicts are returned." *Id*. Accordingly, we find that, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could find defendant guilty of aggravated battery with a firearm beyond a reasonable doubt.

¶ 92                                        III. CONCLUSION

¶ 93      For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 94      Affirmed.